J-A06032-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| J.M. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| B.M. | : | |
| | : | |
| Appellant | : | No. 1082 WDA 2020 |

Appeal from the Order Entered September 17, 2020
In the Court of Common Pleas of Allegheny County Family Court at
No(s): FD17-001973-002

BEFORE: BENDER, P.J.E., LAZARUS, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.: **FILED: April 30, 2021**

Appellant, B.M. (Father), appeals from the order[1] entered in the Allegheny County Court of Common Pleas, awarding J.M (Mother) sole legal custody and primary physical custody, with partial physical custody to Father, of their minor daughter, N.L.M. (Child), born in May 2017. Father avers the

---

[1] While the docket reflects the underlying order was "filed" on September 17, 2020, there is no notation that notice was given and that the order was entered for purposes of Pa.R.C.P. 236(b). **See** Pa.R.C.P. 236(b) ("The prothonotary shall note in the docket the giving of the notice."); **Frazier v. City of Philadelphia**, 735 A.2d 113, 115 (Pa. 1999) ("[A]n order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given."); **see also** Pa.R.A.P. 108(a) ("The date of entry of an order . . . shall be the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.Civ.P. 236(b)."). Thus, the order was not entered and the appeal period not triggered. Although we consider the matter on the merits, we caution the Allegheny County Court of Common Pleas to comply with the rules with regard to the entry of orders.

trial court erred in: (1) precluding him from calling Mother's ex-boyfriend to testify at the custody trial; (2) denying his request for Mother's mental health records; (3) directing him to complete a batterer's program; and (4) divesting him of partial legal custody of Child and decreasing his periods of partial physical custody. We reverse the portion of the trial court's order awarding Mother sole legal custody. However, we affirm the remaining portions of the order, including those pertaining to physical custody. Thus, we affirm in part and reverse in part.

## I. Facts & Procedural History

The trial court summarized the factual and procedural history as follows: Mother and Father were married in May 2015. Trial Ct. Op., 11/13/20, at 1. Mother had primary physical custody of her two children from a previous marriage, who are approximately five and nine years older than Child. *Id.* at 2.

> Father has no additional children. Mother is a Registered Nurse. Father is an engineer with a commendable military service record. Enlisting in the military in 2001, Father remained in active duty for approximately [10] years with [4] deployments to Iraq, serving as a sniper, among other roles. . . . Mother and Father were married during Father's final deployment and subsequent educational pursuits.
>
> Soon after Father's completion of school, the parties began discussing separation. . . .

*Id.*

Pertinent to this appeal, we note that in 2016, Mother was admitted to a psychiatric hospital for "[a] couple weeks"[2] "due to depression and anxiety." *See* Trial Ct. Op. at 16. Mother's sister testified at one of the underlying custody hearings:

> [T]he hospitalization was almost directly related to the circumstances of the marriage[, where Father told Mother] that she was cheating[ and] she was a bad mom, and I think that it was just so much for her, that she was seeing a psychiatrist. Around the time of her hospitalization, Mother discovered that she was pregnant with the parties' child.

*Id.*, *citing* N.T., 2/4/20, at 723.

Child was born in May of 2017. On October 31, 2017, Mother filed a petition for protection from abuse (PFA) against Father, resulting in a temporary PFA order with custody. On November 9th, a consented custody order provided Mother primary custody of Child, subject to Father's periods of partial custody.[3] On November 13th, Mother filed a complaint in divorce. On November 15th, Father filed a modification petition, seeking primary custody, and Mother filed a counter-complaint for custody on November 29th. Since then, "the parties have been engaged in extremely contentious and persistent litigation." Trial Ct. Op. at 2.

---

[2] N.T., 2/4/20, at 723 (testimony of Mother's sister).

[3] Pursuant to this initial custody order, Father had physical custody Tuesday and Thursday from 5:00 to 8:30 p.m., and every other Saturday from 12:00 to 5:00 p.m. Consent Agreement & Order for Expiration of Temporary PFA Order, 11/9/17.

The trial court summarized:

Father's custody was eventually expanded via a "step up" schedule and by May 2018, the parties began exercising a shared 5-2-2-5 physical custody schedule. Persistent problems and disputes between the parties continued after the institution of the shared arrangement. Disputes concerning a "right of first refusal" provision generated additional litigation. Some modifications were made in an effort by the [c]ourt to reduce continuous tensions and in response to sustained motions practice.[4] The litigation was compounded by Father's multiple changes in counsel and stages of litigation where Father proceeded [*pro se*], including . . . the entirety of the custody trial.

Trial Ct. Op. at 2.

On May 16, 2018, Mother filed a praecipe for judicial conciliation. The court-appointed evaluator, psychologist Patricia Pepe, Ph.D., conducted a custody evaluation. *See* Order, 7/9/18. Father also retained psychologist Shannon Edwards, Ph.D., who conducted a parental capacity evaluation of him only.[5] Father made several attempts to obtain Mother's health records

---

[4] Pursuant to an order filed January 5, 2018, Father's periods of physical custody stepped-up by May 2, 2018, to every Wednesday at 8:00 a.m. to Friday at 8:00 a.m. and every other Friday at 8:00 a.m. to Monday at 8:00 a.m. The parties were to exercise the right of first refusal when working or not available for seven hours or more. Consent Agreement & Order for Expiration of Temporary PFA Order, 1/5/18. Subsequent to petitions for contempt, by order dated filed February 21, 2019, Mother was to provide childcare Monday through Friday from 8:00 a.m. until 5:00 p.m. Order, 2/21/19.

[5] Dr. Edwards met with Father only, and did not meet with Mother or Child.

pertaining to her 2016 mental health hospitalization; all of these requests were denied.[6]

Following discovery, conciliation, the court-ordered custody evaluation, and numerous motions, the court conducted a custody trial on February 4, 5, 6, and 18, July 24,[7] and September 16, 2020.[8] Mother was represented by counsel and Father appeared *pro se*. Both parties testified on their own behalf. Additionally, Mother presented the testimony of her twin sister, J.S.; her uncle, D.K.; and the court-appointed custody evaluator, Dr. Pepe, who was accepted as an expert. Dr. Pepe's report was also admitted. Additionally, the court took testimony, *in camera*, of Mother's eight-year-old daughter, E.L.

───────────────────────────

[6] Father unsuccessfully requested Mother's records from St. Clair Hospital on multiple occasions prior to trial. N.T., 2/4/20, at 107. On September 13, 2019, the trial court denied Father's Motion to Quash Mother's Objection to Subpoena to St. Clair Hospital. Order, 9/13/19. Father then sought such records for review by his expert, Dr. Shannon Edwards. *See* Father's Motion to Permit Expert Review of Psychological Records, 2/5/20. This request was denied by order filed January 3, 2020. Order, 1/3/20. Thereafter, Father filed a motion, requesting both parties submit to a new psychological examination. *See* Father's Motion for New Psychological Evaluation, 1/31/21. This motion was denied on January 31, 2020. Order, 1/31/20.

[7] The delay between February and July was a result of the COVID-19 pandemic. N.T., 7/24/20, at 3.

[8] The final hearing on September 16, 2020, was precipitated by new pleadings arising from a dispute related to vacation time. The court indicated that it was considering such testimony as part of the custody record. N.T., 9/16/20, at 4.

Father presented the testimony of his step-father, S.H.; his father, D.M.; his mother, C.H.; his friend, L.D.; Dr. Edwards, who was accepted as an expert and who had conducted a parental capacity evaluation of Father only; Dr. Edwards' intern, Aubrey Grudowski; and Father's counselor, Michelle Steimer, Ph.D. Dr. Edwards' full report was admitted over Mother's motion *in limine*.[9] N.T., 2/5/20, at 609. Pertinent to this appeal, the trial court precluded Father from calling Mother's ex-boyfriend as a witness.

At the conclusion of the September 16, 2020, hearing, the trial court awarded Mother sole legal custody[10] and primary physical custody, subject to Father's partial physical custody.[11] Specifically, the court granted Father partial physical custody every other weekend from Friday at 5:00 p.m. until

---

[9] Over the course of the six hearings, both parties presented voluminous amounts of exhibits. We observe that while all of Father's exhibits are included with the certified record, not all of Mother's exhibits are included. Nevertheless, Mother's exhibits are included in the reproduced record. As veracity is not in dispute, we rely on the copies contained within the reproduced record. **See Commonwealth v. Barnett**, 121 A.3d 534, 544 n.3 (Pa. Super. 2015) ("While this Court generally may only consider facts that have been duly certified in the record, where the accuracy of a document is undisputed and contained in the reproduced record, we may consider it.")

[10] Mother was granted "sole authority to make all decisions respecting the child's education, medical needs, and all other major decisions respecting the child (including the issuance of a passport), except that each party may make decisions about the child's participation in religious activities during his/her physical custody time. Mother shall provide Father [ ] with reasonable access to medical and academic information." Final Custody Order, 9/17/20, at ¶ 2.

[11] A written custody order was entered on September 17, 2020.

Monday at 8:00 a.m., with exchanges at a Sheetz store. Final Custody Order, 9/17/20, at ¶¶ 3, 5. The court further set forth a vacation and holiday schedule, and directed that all child-related communication between the parties be made through Our Family Wizard. *Id.* at ¶¶ 4, 6, 9. Finally, the court included the following behavioral health provisions:

> a. Mother shall continue to attend therapy and outpatient sessions unless and until recommended otherwise by the provider/therapist.
>
> b. Father shall participate in on-going psychotherapy to address anger and controlling behavior.
>
> c. Father shall enroll in and successfully complete a Batterer's Intervention program, with the number of sessions being determined by the facilitator.

*Id.* at ¶ 8.

> We note the trial court described the parties' relationship as follows:
>
> This Court has concluded that as of the date of its custody decision, a "power and control" dynamic continued to exist between the parties, which is detrimental to Mother and [Child]. The Court observed this dynamic through the [6] days of trial, during which the Court assessed credibility, attitude, demeanor, character, intelligence, and sincerity of the parties and witnesses. This dynamic was also apparent through the Court's review of the [16] custody factors in determining the best interest of the child.

Trial Ct. Op. at 3.

On October 14, 2020, Father filed a counseled notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The court issued a Rule 1925(a) opinion on November 13, 2020.

## II. Questions Presented & General Standard of Review

On appeal, Father raises the following issues for our review:

A. Whether the Trial Court erred as a matter of law and abused its discretion by making various rulings at trial, and prior to trial, which unfairly prejudiced [F]ather, especially considering that the trial court's determination was based largely on alleged events prior to the parties' separation?

B. Whether the trial court erred and committed an abuse of discretion by requiring in its final order that Father attend a batterer's intervention program?

C. Whether the Trial Court erred as a matter of law and abused its discretion in entering an Order dramatically reducing Father's shared overnight custody and stripping Father of his legal custody rights to the child, an Order based primarily on speculation and not supported by the enumerated custody factors?

D. Whether the Trial Court erred as a matter of law and abused its discretion by entering an Order and custody schedule which will serve to damage and substantially, but negatively, impact the relationship between Father and the child without sufficient reasoning as to how [its] final Order, which creates periods of time where the Father will not see the child for up to eleven (11) days meets the best interests of the child?

Father's Brief at 9.[12]

"Our paramount concern in child custody cases is the best interest of

the child." ***M.A.T. v. G.S.T.***, 989 A.2d 11, 19 n.9 (Pa. Super. 2010) (*en banc*)

(citation omitted). We note our standard of review of custody matters:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual

_____

[12] We have reordered Father's issues for ease of review.

determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***C.R.F. v. S.E.F.***, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

[T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

***Ketterer v. Seifert***, 902 A.2d 533, 540 (Pa. Super. 2006) (citation omitted).

In addition,

[a]lthough we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

***M.A.T.***, 989 A.2d at 18-19 (citations omitted).

## III.  Evidentiary Rulings

In his first issue, Father challenges several evidentiary rulings. We note

the standard of review and address his particular claims *seriatim*.

[T]he decision of whether to admit or exclude evidence is within the sound discretion of the orphans' court. A reviewing court will not disturb these rulings absent an abuse of discretion. Discretion

is abused if, inter alia, the orphans' court overrides or misapplies the law.

***In re A.J.R.-H.***, 188 A.3d 1157, 1166–67 (Pa. 2018) (citations omitted).

First, Father challenges the trial court's granting of Mother's motion *in limine* to preclude him from calling Mother's ex-boyfriend as a witness. Father's Brief at 36-37. Father argues the ex-boyfriend would have "rebut[ted] portions of Mother's testimony" and would have "establish[ed] a pattern of Mother making false claims about domestic violence." ***Id.*** at 37. Father avers he "should have been granted wide latitude to attempt to demonstrate Mother's lack of credibility" as to his alleged domestic violence. ***Id.*** No relief is due.

Pennsylvania Rule of Evidence 401 provides:

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

Pa.R.E. 401(a)-(b). Rule 403 provides:

The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Pa.R.E. 403.

With respect to precluding Father from calling Mother's ex-boyfriend as a witness, the trial court explained:

. . . Father could not articulate how this testimony would correspond with the Court's goal of determining what is in the best interest of the child. . . .

Two basic evidentiary rules govern the matter complained of by Father. First, and as a general rule, any witness must have personal knowledge of the matter at issue. Pa.R.E. 602. Second, the trial judge is permitted to exercise reasonable control over the mode and order of examining witnesses so as to avoid wasting time and to protect witnesses from harassment or undue embarrassment. Pa.R.E. 611(a).

In accordance with both of these rules, the Court declined to hear testimony from Mother's ex-boyfriend after entertaining argument on the record. Father was unable to identify how this witness could specifically address any of the sixteen custody factors considered in determining the best interest of the child. The witness's testimony would have been wasteful of time in the context of this lengthy custody trial. Further, the court concluded that Father sought this testimony as a means of making general attacks towards Mother and to harass and unduly embarrass Mother. Therefore, this witness was properly precluded from testifying.

Trial Ct. Op. at 13-14 (record citations omitted and paragraph break added).

Our review of the record supports the trial court's reasoning. We note the following argument at the July 24, 2020, proceeding regarding Father's request to present evidence about Mother's prior relationship:

[Father]: . . . I think that [Mother's] Motion *in Limine* is an attempt to exclude information from parts of [Mother]'s past relationships and her attempting to handpick what they [sic] can argue and what would be applicable. Whereas, I think the Court should see the broader picture and all of the information.

THE COURT: Okay. It's the Court's role to decide what is in the best interest of [Child] in this case, with a review of several factors, 16 factors, in fact.

**What I'm not hearing is that there is specific testimony in rebuttal that was providing an event that [Mother's ex-**

- 11 -

**boyfriend] is going to testify about.** I'm not hearing that. My understanding is the period of time between [Mother]'s relationship with [her ex-boyfriend] did not overlap with [Father]'s relationship. And even if it did, I'm not sure that it would be relevant.

Unless there would be a specific factual sequence that this witness is here to testify about, I'm not going to allow it. I'm not going to allow generalities about somebody's propensity for promiscuity or something of that nature.

**It sounds to me like this is generalities**, unless, [Father], like I said, there is a very specific, like I said, set of facts or events that you would like this witness to testify, he's not permitted to testify.

[Father]: Well, Your Honor, I would be concerned that much of [Mother's] testimony as it relates to the factors were claims of promiscuity by myself. I'm just a little confused as to why I could not argue the same and have a witness which would corroborate it.

THE COURT: Well, that is not going to be relevant to what is in the best interest of the child. Again, this is a generality that I'm not going to give — whatever evidence is already admitted, I'll give due weight to. But I'm not seeing again a specific connection to this particular witness to this case and I'm going to grant [Mother's] Motion *in Limine*[.]

N.T., 7/24/20, at 12-14 (emphases added).

We conclude the trial court did not abuse its discretion in precluding Father from calling Mother's ex-boyfriend as a witness. *See A.J.R.-H.*, 188 A.3d at 1166–67. As the court found, Father was unable to offer any specific basis for this testimony when given the opportunity by the court, but rather he sought to introduce "generalities" about Mother's past romantic relationships.

- 12 -

Next, Father contends the trial court erred in denying his motion to permit his expert, Dr. Edwards, to review Mother's health records from her mental health hospitalization in 2016, prior to Child's birth. *Id.* at 38-40. Father claims the production of the records for this limited purpose would have — contrary to the trial court's conclusion — complied with *Gates v. Gates*, 967 A.2d 1024 (Pa. Super. 2009). Father's Brief at 38-39. He reasons: (1) "Mother's mental health records, and any potential diagnosis, is clearly relevant to custody" pursuant to 23 Pa.C.S. § 5328(a)(15); (2) "the trial court abused its discretion by failing to permit the release of records to Dr. Edwards for the purpose of impeaching [court-appointed evaluator] Dr. Pepe's evaluation, along with impeaching Mother's testimony . . . regarding her own mental health;" and (3) the release of the records solely to Dr. Edwards, and not to Father, would have "adequately safeguarded" "Mother's privacy and the confidentiality of the records, which was the crux of the [*Gates*] decision." *Id.* at 39. We conclude no relief is due.

As to the confidentiality of mental health records, Section 7111 of the Mental Health Procedures Act[13] (MHPA) provides:

> (a) **All documents concerning persons in treatment shall be kept confidential and, without the person's written consent, may not be released or their contents disclosed to anyone except**:
>
> > (1) those engaged in providing treatment for the person;

---

[13] 50 P.S. §§ 7101-7503.

(2) the county administrator, pursuant to section 110;

(3) a court in the course of legal proceedings authorized by this act; and

(4) pursuant to Federal rules, statutes and regulations governing disclosure of patient information where treatment is undertaken in a Federal agency.

In no event, however, shall privileged communications, whether written or oral, be disclosed to anyone without such written consent. . . .

50 P.S. § 7111(a)(1)-(4) (emphasis added).

This Court has explained:

[**Gates**, 967 A.2d 1024], is the seminal case addressing the disclosure of confidential mental health information during custody proceedings. In **Gates**, we addressed the confidentiality provisions outlined in the Mental Health Procedures Act[,] 50 P.S. § 7111(a)[,] and the statutory privileges outlined in the Judicial Code, 42 Pa.C.S. § 5944, regarding confidential communications to psychiatrists or licensed psychologists.

**M.M. v. L.M.**, 55 A.3d 1167, 1171 (Pa. Super. 2012) (footnotes omitted).

In **M.M.**, the trial court ordered the father, over objection, to disclose to the mother his mental health records relating to hospitalization and post-hospitalization treatment. **M.M.**, 55 A.3d at 1170. In reversing in part and remanding, this Court held that the MHPA "is equally applicable in a custody dispute as it is in a civil matter[,] especially where . . . less intrusive alternatives exist to determine the effect of a party's mental health upon the child's best interest." **Id.** at 1173, *citing* **Gates**, 967 A.2d at 1032. Important to this Court was the "expectation of confidentiality." **Id.** at 1174. This Court

- 14 -

stated, "[T]he importance of confidentiality cannot be overemphasized [and] [t]he purpose of the [MHPA] would be severely crippled if a patient's records could be the subject of discovery in a panoply of possible legal proceedings." *Id.* (citation omitted). Instead, noting the "chilling effect" of disclosure of statutorily privileged mental health records, the Court expressed its preference for less intrusive means, such as an updated psychological evaluation. *Id.* at 1175. *See also Gates*, 967 A.2d at 1032 (trial court's order to release mental health records violated mother's statutory right of confidentiality, where a "less intrusive means" existed to enable the court to make a custody determination — the mother's testimony and a custody evaluation, if necessary).

In support of its rulings to exclude Mother's prior mental health records, the trial court reasoned:

> . . . This Court . . . found that Father's continued attempts to obtain Mother's mental health records were another mechanism to assert dominance over Mother and were ultimately repetitive and harassing. [Father requested Mother's mental health records at least four times prior to trial.] Mother's hospitalization occurred four years prior to trial without subsequent incident.
>
> Additionally, the court appointed expert, Dr. Pepe, met with both parties and reviewed their mental health history with them personally, rather than reviewing the documentation. As an expert, the Court relied on Dr. Pepe's testimony as to what she needed to review when conducting a custody evaluation. . . . Dr. Pepe's conclusion that the mental health records of either party were not important in her evaluation further supports the Court's prior decisions that the benefit of this information in the context of this custody trial does not outweigh the privacy concerns associated with Mother's behavioral health records.

- 15 -

Nor was Father's expert[, Dr. Edwards,] entitled to this information. Father's expert was hired by Father to perform additional testing that could rebut the court appointed expert, Dr. Pepe, solely in relation to conclusions about Father. Father's expert did not meet with Mother; she was called to provide an opinion on **Father's** capacity and ability to parent. As a result, the Court found it improper for Father's expert to be privy to Mother's mental health records.

Lastly, the Court did not fail to consider Mother's mental health, but rather gave it due weight in accordance with the testimony and evidence admitted. Significant testimony was provided at trial regarding Mother's psychiatric hospitalization in 2016 due to depression and anxiety. This included expert testimony from Dr. Pepe, who specifically noted that in her first meeting with Father, he mentioned Mother's hospitalization and questioned whether it was "sufficient evidence to prevent her ability to parent the child." Moreover, testimony by Mother's sister indicated that the hospitalization was almost directly related to the circumstances of the marriage. Her testimony included, ". . . he was saying that she was cheating, that she was a bad mom, and I think that it was just so much for her, that she was seeing a psychiatrist." Around the time of her hospitalization, Mother discovered that she was pregnant with the parties' child.

The Court considered the testimony related to Mother's hospitalization, the reasons for its occurrence, and Mother's then-current mental state when rendering a decision. Notably, the timing of the hospitalization is consistent with Mother's testimony that the abuse in the relationship continued to escalate. [Mother filed a PFA Petition just months after the hospitalization.]

Based upon the expert testimony of Dr. Pepe, fact witness testimony from Mother's family, and direct averments from Mother, this Court concluded that Mother's hospitalization was situational and related to the control and abuse she endured. . . .

Trial Ct. Op. at 14-16 (record citations omitted and paragraph break added).

We emphasize that in arguing his expert, Dr. Edwards, was entitled to review Mother's 2016 mental health records, Father fails to address the trial court's reasoning that Dr. Edwards' task was to evaluate Father only — and

not Mother. *See* Trial Ct. Op. at 15. Father also ignores Dr. Edwards' own testimony that Mother's mental health records **were not relevant** to her evaluation of Father. At the February 5, 2020, proceeding, Dr. Edwards stated:

> Specifically I was tasked [to] provide a psychological evaluation of [F]ather to the Court. I did not need to interview [M]other. I wasn't providing a custody evaluation [or] an independent psychological evaluation.
>
> *   *   *
>
> **In fact, when [Father] wanted to obtain [Mother's] mental health records, I said they're not relevant. I'm not concerned about that. I'm concerned about you and the evaluation is about you.**

N.T., 2/5/20, at 596 (emphasis added).

In light of Dr. Edwards' testimony and the trial court's discussion that it had considered and weighed other evidence about Mother's 2016 mental health hospitalization, we conclude the court did not abuse its discretion in precluding Dr. Edwards from evaluating the mental health records. *See* 50 P.S. § 7111(a)(1)-(4); *A.J.R.-H.*, 188 A.3d at 1166–67; *M.M.*, 55 A.3d at 1171.

### IV. Batterer's Intervention Program

In Father's second issue on appeal, he challenges the trial court's order that he submit to a batterer's intervention program. Father's Brief at 29-32. Father asserts this requirement is unreasonable, where: "there was never a CYF investigation or finding of abuse, there was never an arrest or charges

filed against Father, and there was never any allegation that Father has abused [C]hild." Father's Brief at 30-31. He reasons, "The program is not connected in any logical basis to a necessary safeguard for the minor child, or an expansion of custody for Father." *Id.* at 31. Father also emphasizes he was previously awarded, and the court's instant order continues to award, unsupervised custody of Child. He contends the batterer's program requirement is "punishment . . . for alleged past deeds" and "the Trial Court's personal disdain for Father," where there is no evidence that he ever harmed Child and evidences a "disdain" for Father. *Id.* at 31-32. We conclude no relief is due.

Section 5323(e) of the Child Custody Act[14] provides:

> **Safety conditions.--**After considering the factors under section 5328(a)(2), if the court finds that there is an ongoing risk of harm to the child **or an abused party** and awards any form of custody to a party who committed the abuse or who has a household member who committed the abuse, the court shall include in the custody order safety conditions designed to protect the child or the abused party.

23 Pa.C.S. § 5323(e) (emphasis added).

Furthermore, Pennsylvania Rule of Civil Procedure 1915.10(b), pertaining to custody orders, provides, in part:

> (2) If the court has made a finding that **a party** or child is at risk of harm, the court's order shall include safety provisions for the endangered party's or child's protection.

---

[14] 23 Pa.C.S. §§ 5321-5340.

Pa.R.C.P. 1915.10(b)(2) (emphasis added). The 2019 explanatory comment

to this rule clarifies:

> Subdivision (b) further defines and reinforces the requirements in 23 Pa.C.S. § 5323(e). Examples of safety provisions include, but are not limited to, supervised physical custody, a supervised or neutral custody exchange location, a neutral third-party present at custody exchanges, telephone or computer-facilitated contact with the child, no direct contact between the parties, third-party contact for cancellations, third-party transportation, and designating a secure, neutral location as respository [sic] for a child's passport.

Pa.R.C.P. No. 1915.10, *cmt.*

Here, in support of its requirement that Father attend a batterer's

intervention program, the trial court reasoned:

> [T]his Court has the authority to consider any present or past abuse by a party, whether there is a continued risk of harm and which party can provide adequate physical safeguards and supervision of the child. 23 Pa.C.S. § 5328(a)(2); Pa.R.C.P. 1915.10. This Court found that Father engaged in physically and mentally abusive behavior throughout his marriage to Mother. Father still attempts to exert control over Mother in their more limited interactions to date. These conclusions are supported by the credible testimony of Mother, Mother's sister, Dr. Pepe, and Mother's young child, [E.L.]; evidence of bruising on Mother; evidence of Mother seeking help from neighbors while informing Father that she did not tell them about an abusive episode; the procedural history surrounding the PFA Petition; and more recent text messages from Father of verbal assassinations towards Mother.
>
> This Court not only found that Father engaged in abusive behavior towards Mother, which was witnessed by her two other children, but it also found that Mother and [C]hild are still impacted by controlling, regulatory behaviors by Father. By way of example, this past summer, Father sent a text message to Mother stating, "You're 40 years old. Don't blame your mistakes on my three-year old daughter." This was after Mother informed

Father that she would be a few minutes late to an exchange because the minor child needed to use the restroom.

More recently, Father submitted an Emergency Motion for Special Relief to this court on Friday, September 4, 2020 at 6:36 p.m. Father's motion was submitted on the basis that Mother did not appear for a custody exchange at 5:00 p.m. that evening. Importantly, there have never been accusations that the child is unsafe or exposed to dangerous conditions while with Mother. Rather than explore whether an accident or mistake was the reason why Mother did not appear, Father's immediate responses were to draft and submit an emergency motion to the court and threaten police involvement. Upon realizing her error, Mother apologized and informed Father that she had misinterpreted the exchange dates and that it was an honest mistake. She exchanged the child that same evening while offering Father make-up time for the delayed hours. Nonetheless, Father insisted on proceeding on a contempt petition.

The Court is not satisfied that Father has recognized or addressed his underlying control issues that have led to abuse. Batterer's intervention programs require the participants to recognize their past and address it. This therapeutic safety provision is important for the dynamics in the relationship between Mother and Father and also for the interpersonal relationship between Father and [Child] as she continues to grow and develop. The provision is also supported by the expert opinion of Dr. Pepe.

In addition to completion of the Batterer's intervention program, the final order also implemented the following additional conditions: a reduction in Father's physical custody; legal custody in favor of Mother; consistent therapy sessions for both parties; and communication that is limited solely to Our Family Wizard. Pennsylvania statutes do not explicitly provide safety conditions for the court to utilize. However, explanatory comments provide a non-exhaustive list of permissible safety provisions including how the parties communicate and considerations regarding exchange locations. Pa.R.C.P. 1915.10. Thus, implementing safety conditions is within the sole discretion of the trial judge. Batterer's intervention and similar programs are not included in the statute; however, it is common practice of the Commonwealth to order parties to attend such social programming. . . .

Trial Ct. Op. at 9-11 (record citations omitted and paragraph break added).

We conclude the trial court's order that Father participate in a batterer's intervention program is not an abuse of discretion. *See C.R.F.*, 45 A.3d at 443. Father's repeated insistence, that there has been no finding of abuse with respect to **Child**, is not dispositive, as both Section 5323(e) of the Child Custody Act and Rule of Civil Procedure 1915.10(b)(2) contemplate findings that, respectively, "an abused party" and "a party," are at risk of harm. *See* 23 Pa.C.S. § 5323(e); Pa.R.C.P. 1915.10(b)(2). Here, the trial court discussed at length its findings of credible evidence that Father engaged in abusive behavior against Mother. To the extent Father argues this Court should disregard those findings, we cannot do so. *See C.R.F.*, 45 A.3d at 443. The trial court properly considered Rule 1915.10(b)(2) and exercised its discretion to enter certain safety measures it deemed appropriate. The evidence of Father's past abuse and, more importantly, continuing behavior, as well as the court's underlying mission to provide for Child's best interests, support the order that Father participate in a batterer's intervention program.

### V. Modification of Physical & Legal Custody

We address together Father's third and fourth issues, which overlap and go the trial court's modification of the parties' physical and legal custody. As stated above, prior to the instant custody order, the parties shared **legal** custody and had "a shared 5-2-2-5 **physical** custody schedule," under which Father had physical custody from every Wednesday at 8:00 a.m. to Friday at

8:00 a.m., and every other weekend, from Friday at 8:00 a.m. to Monday at 8:00 a.m. ***See*** Trial Ct. Op. at 2 (emphasis added). The underlying order awarded Mother sole legal custody and reduced Father's periods of physical custody to every other weekend, beginning at Friday at 5:00 p.m. to Monday at 8:00 a.m.

For ease of review, we first set forth the relevant law and the trial court's findings, then summarize Father's arguments on appeal. Section 5328(a) of the Child Custody Act sets forth the best interest factors a trial court must consider in awarding custody. ***E.D. v. M.P.***, 33 A.3d 73, 79-80 (Pa. Super. 2011). That section provides:

> **(a) Factors.—**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
>
> (2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).
>
> (3) The parental duties performed by each party on behalf of the child.
>
> (4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a)(1)-(16).

This Court has explained:

When deciding a petition to modify custody, a court must conduct a thorough analysis of the best interests of the child based on the relevant Section 5328(a) factors. "**All** of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." . . .

*A.V. v. S.T.*, 87 A.3d 818, 822-23 (Pa. Super. 2014) (some citations omitted).

Section 5328 provides that "the only factors that should be given 'weighted consideration' are factors that 'affect the safety of the child[.]'" *M.J.M. v. M.L.G.*, 63 A.3d 331, 338 (Pa. Super. 2013). Nevertheless, "[i]t is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." *Id.* at 339.

At the September 16, 2020, proceeding, the trial court stated the following findings with respect to the Section 5328(a) custody factors. For ease of review, we also set forth the court's discussion in its opinion.

[(1): W]hich party is more likely to encourage and permit frequent and continuing contact between the child and another party?

The Court finds that at the current time neither party fares particularly well on this factor, but that [M]other, if given the opportunity, will be more likely to encourage the relationship. At the current time [M]other hasn't had that opportunity.

These parties have resorted to parallel parenting, and that's largely a result of [M]other having to disengage from [F]ather's conduct. While both parties have contributed to the dynamics in this case, the Court finds that [M]other is constantly on the defense.

[(2):] Is there present and past abuse committed by any party or member of the party's household?

This factor favors [M]other. The Court found there to be credible evidence that [F]ather has been physically abusive to

- 24 -

[M]other in the past. Though the physical abuse has subsided in recent years [F]ather's psychological abuse was supported by compelling and credible evidence.

The psychological abuse has been demonstrated through, among other things, [F]ather's historical writings, the continuing interactions with [M]other through the present, and his conduct in the course of these proceedings.

Again, today exemplifies the fact that [F]ather's actions lack proportion . . . . to what he perceives as substandard conduct on the part of [M]other.

[(2.1) Consideration of child abuse and involvement with protective services:] This factor is not applicable to this case. Any investigations by CYF were unfounded.

[(3):] What are the parental duties performed by each party on behalf of the child? . . .

Both parents do perform and are capable of performing the daily parental duties on behalf of [C]hild. . . . I find . . . the parental duties are performed by both [parents and C]hild is bonded to both parties. [Thus,] some . . . physical custody time, will be awarded to both parents.

[(4):] The need for stability and continuity in the child's education, family life, and community life.

This factor too favors [M]other. Mother has demonstrated through credible evidence that she provides stability and continuity for her three children.

Again, based on the evidence provided[, C]hild is bonded to [F]ather, and there does need to be some continuity in that relationship. However, [F]ather's unyielding conduct interferes with the stability that [M]other is attempting to provide to [F]ather [sic[15]].

---

[15] While the transcript states, "[F]ather's unyielding conduct interferes with the stability that [M]other is attempting to provide to **[F]ather**," we presume the trial court was referring to "Child." *See* N.T., 9/16/20, at 60.

While both parties have contributed to this toxic dynamic that exists in this relationship and the need to resort to parallel parenting rather than any productive communication, [F]ather is more intent on driving this relationship and this litigation forward in a way that has become more punishing towards [M]other.

[(5):] The availability of extended family.

Both parties have extended family that assists with and that are bonded to [C]hild.  . . .

[(6):] What are the child's siblings relationships?  This factor favors [M]other.  Two siblings on [M]other's side are bonded with [C]hild[.]

[(7):] The well reasoned preference of the child based on the child's maturity and judgment.

This factor is not applicable.  [C]hild is now three years old.

[(8):]  The attempts of a parent to turn the child against the other . . . parent[,] except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

This factor was partially addressed in factors 1 and 2 above. In addition, given [F]ather's resistance to flexibility, the Court finds that it would be difficult and almost impossible for [F]ather to cooperate with [M]other, and that [C]hild will be turned against [M]other by virtue of [Father's] unrealistic expectations of [M]other.

[Trial court opinion: Factor (8) favors Mother.  Substantial, credible testimony existed that Father would often tell the children that they had a bad mother and he would find them a good mother.  The conclusion that Father cannot separate his personal vendetta against Mother from parenting and [Child] is further supported by [Mother's] Exhibit E; an email from Father to Mother titled "[N.L.M.]"  Instead of discussing pertinent custody matters, Father berates Mother and accuses her of manipulation.]

[(9 and 10):  W]hich party is more likely to maintain a loving, stable, consistent, and nurturing relationship with the child

adequate for the child's emotional needs, and . . . which party is more likely to attend to the daily physical, emotional, developmental, education, and special needs of the child?

These factors favor [M]other. Mother has demonstrated the ability of a loving, stable, consistent, nurturing environment, and that she's able to attend to the daily physical, emotional, developmental, and educational needs of all three of her children.

The Court finds that [F]ather does provide love and a nurturing relationship with [Child], and for this reason he will retain some physical custody time.

[Trial court opinion: Factors (9) and (10) favor Mother. Substantial, credible evidence was admitted regarding Father's parenting practices towards Mother's two other children. This included making the children do push-ups; creating a strict and unrealistic chore chart; locking the child in the basement; preventing the family from using the restroom indoors; and giving the children a maximum of 10 seconds to complete tasks before receiving discipline. Considering the young age of the children, none of these actions taken by Father were appropriate. This Court recognizes Father's testimony that he was new to parenting when he came into the marriage and that his new role proved to be a challenge. His sentiments were given due weight. Ultimately, however, the Court concluded that Father still has significant control issues to address before the Court can conclude that Father has changed from his initial days of parenting.]

[(11):] The proximity of the parties' residences. This factor favors neither parent. Father resides in Moon Township. Mother resides in Shaler Township.

At this time they're able to travel back and forth. This will become more difficult as [C]hild reaches school age, and travel may be an issue at that time. But the Court currently finds that the proximity allow[s] for exchanges in custody without burden.

[(12):] Each party's availability to care for the child or ability to make appropriate child care arrangements.

This factor favors neither party. Each party is capable to provide appropriate child care arrangements.

[(13):] The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.

The parties' effort to protect [C]hild from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

This is an extremely high conflict relationship. Unfortunately, the conflict has caused the parties to completely retreat to the point of no communication or very little communication I should say. Blame was placed by each party on the other party.

This is not a case where at this time I think co-parent counselling would be beneficial because each party needs to work on certain things before we even get to that point.

The level of conflict is so great and has caused this parallel parenting, which clearly is not working based on the contentiousness that was . . . exemplified through the evidence, and also the level of litigation involved in this case, and **a shared legal custody arrangement is simply untenable.**

Given the controlling behaviors exhibited by [F]ather, the level of conflict is unlikely to subside. Litigation coupled with [F]ather's intellect provide a new opportunity and a new tool for him to negatively engage [M]other.

[Trial court opinion: Factor (13) favors Mother. Both parties have engaged in behaviors that depict a high level of conflict in this case. Notably, both parties hired private investigators to ensure the custody order was being followed. Additionally, the parties have been unable to agree on decisions regarding medical care and educational needs. Both parties have engaged in scheduling separate appointments for the same issues and have put efforts towards Pre-K schooling without first receiving consent from the other party. Despite the guidance within previous court orders, the parties were unable to maintain a holiday or vacation schedule. Based upon the evidence of record and this Court's own observations of the parties during trial, the Court concluded that Mother engages in this behavior in reaction to Father. The Court concluded that Mother is often put in the defensive position to accept insistence by Father, without the ability to negotiate or seek mutually beneficial outcomes. **Further, the Court believes**

**that the only way this cycle may cease is to award Mother legal custody as a means of limiting Father's ability to control the dynamic.** The same rationale supports awarding Mother primary physical custody, particularly corresponding to weekdays, when legal custody decisions are often executed and consistency is crucial.]

[(14):] The history of drug or alcohol abuse of a party or member of a party's household.

The Court did not find there to be credible, relevant, and current evidence of any such abuse.

[(15):] The mental and physical condition of a party or member of a party's household.

Both parties contribute to a cycle of an unhealthy dynamic that is unfortunately evidence of a controlling and abusive cycle. The Court finds that [M]other is seeking help for her behaviors that contribute to this dynamic, and very distinct and very importantly the Court finds that [F]ather lacks awareness and is currently not amenable to accepting the help that he needs for his behaviors.

At times during the course of the custody trial[, F]ather was reflective, but the Court is not convinced that that awareness and commitment to improvement is there at the current time.

[(16):] Any other relevant factor.

This Court interviewed [M]other's minor child [E.L. E.L.] spoke to the Court in a way that was full of raw emotion. It was not a reaction that could be coached. It was not a reaction that could have been influenced.

[E.L.] had very significant trauma resulting from her interactions with [Father]. The Court recognizes that we are talking about [C]hild in this case, but [E.L] was credible in refuting some of the things that [Father] testified about, including that physical abuse did not occur between [Father] and [Mother] and that [E.L.], indeed, was present and very vividly recalls him cutting [Mother]'s clothes in front of her.

N.T., 9/16/20, at 57-66 (emphases added); Trial Ct. Op. at 8-9.

The trial court also reasoned in its opinion:

[A] change to the status quo custody arrangement between Mother and Father was in the best interest of [C]hild. The prominent factors supporting this conclusion include factor 2 (evidence of abuse); factor 8 (attempts to turn the child against a parent); factor 9 (maintenance of a loving, stable, consistent, and nurturing home); factor 10 (attending to the daily physical, mental, emotional, developmental, educational, and special needs of the child); factor 13 (the level of conflict between the parties); factor 15 (mental and physical condition of the parties); and factor 16 (any other relevant factor). 23 Pa.C.S. § 5328(a).

Trial Ct. Op. at 4.

On appeal, Father presents the following arguments: the trial court's analysis of the custody factors was "unreasonable given the testimony and evidence presented." Father's Brief at 18-19. The underlying order divests him of all legal custody rights and "mandates that Father will now go [11] days without seeing [C]hild." *Id.* at 19. The court's decision "is closer to terminating Father's parental rights to the child . . . than to" the shared custody arrangement that was "the multi-year status quo." *Id.* at 29. This "overwhelming swing of the custody pendulum" is not supported by any "significant evidence of trauma, abuse, neglect, conflict, or general parental deficiency since the entry of the shared custody Order in 2018." *Id.* at 29. Although the

[c]ourt clearly gave great weight to Factor 2, . . . the present and past abuse committed by a party[,] whether there is a continued risk of harm to the child[,] and which party can better provide adequate physical safeguards and supervision of the child, . . . there was never a final PFA entered regarding any abuse[,] Father was never arrested or charged with any crimes regarding physical abuse[, t]here was absolutely no abuse alleged of [Child], and the

- 30 -

allegations of abuse against Mother were [3] years old at the time of trial.

*Id.* at 19-20.  Additionally, Father's "alleged abuse . . . did not prevent Mother from consenting to a shared custody Order in January 2018 . . . and there was no evidence or testimony as to any abuse of **anyone** by Father since the parties' separation."  *Id.* at 20.

Father further avers the following with respect to the Section 5328(a)(8) factor — "[t]he attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm."  *See* 23 Pa.C.S. § 5328(a)(8).  The court's analysis, that Child "will be turned against Mother because of [Father's] unrealistic expectations of Mother," is speculation.  Father's Brief at 21.  Father also addresses the court's findings under Sections 5328(a)(9) and (10) — "[w]hich party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child" and "[w]hich party is more likely to attend to the [child's] daily physical, emotional, developmental, educational and special needs."  *See* 23 Pa.C.S. § 5328(a)(9)-(10).  Father avers the trial court's consideration of Mother's care of her other children is "unfair," as he "does not have other children."  Father's Brief at 22.  In any event, the record was "replete with testimony and evidence that Father is providing a loving and caring environment for [Child,] he unquestionably can meet [C]hild's daily physical, emotional, developmental, and educational needs[,]" and he "has been a consistent presence in [C]hild's life."  *Id.*  "[T]he vast majority of the

Trial Court's factors . . . concern[ ] events which occurred prior to the parties' separation." *Id.* at 29; *see also id.* at 31.

Father also challenges the trial court's findings under Section 5328(a)(13) — "[t]he level of conflict between the parties and the willingness and ability of the parties to cooperate with one another" — as a basis to strip him of his legal custody. Father's Brief at 24. He contends the following: there was no evidence supporting a conclusion that the parties cannot share legal custody. *Id.* Although "[r]emoving [him] as a co-parent will certainly make Mother's life easier, and potentially create less litigation . . . that cannot be the basis of the sole legal custody award to Mother." *Id.* at 25. The court found "both parties contributed to an unhealthy dynamic . . . and abuse and controlling cycle," but Mother was seeking help for her behaviors while Father did not. *Id.* This reasoning ignores the testimony of his therapist, Dr. Steimer, that she treated Father up to 50 hours and that "Father was committed to his goals." *Id.* at 26.

Finally, we note Father argues:

> There was no custody, visitation, or any contact granted to Father on the weeks where he does not have weekend custody. There was no communication (Facetime, telephone calls, etc.) provided . . . so that Father may see his daughter during the [11] days without physical contact. It is an extraordinary reduction of custody, and there simply is insufficient justification for this almost complete lack of contact, especially considering the evidence and testimony presented at trial, as well as the multi-year status quo of shared custody.

*Id.* at 32-33 (record citations omitted). In so arguing, Father points to a lack of evidence of abuse, neglect, mistreatment, or parental deficiency, and contends that, similar to *M.J.N. v. J.K.*, 169 A.3d 108 (Pa. Super. 2017), the court's analysis was unreasonable and that a shared custody order should be reinstated. Father's Brief at 34-35.

After a thorough review of the record, including the voluminous transcripts, the trial court's opinion, and both parties' briefs, we affirm the trial court's modification of the **physical** custody schedule, but reverse the award of sole **legal** custody to Mother. We emphasize that we defer to the trial court's findings of credibility and weight of the evidence. *See C.R.F.*, 45 A.3d at 443. We do not disturb the trial court's finding "that Father engaged in physically and mentally abusive behavior **throughout his marriage** to Mother[, and] still attempts to exert control over Mother in their more limited interactions to date." *See* Trial Ct. Op. at 9 (emphasis added). While the trial court ordered Father to complete a batterer's intervention program, the court's reasoning was for Father to "recognize[ ] or address[ ] his underlying control issues that have led to abuse," and to "recognize [his] past and address it." *See id.* at 10. Nevertheless, a careful review of the trial court's discussion supports Father's contention that there are no allegations, nor findings, of recent or current abuse against Mother or Child. *See also* N.T., 9/16/20, at 58 ("The Court found . . . credible evidence that [F]ather has been physically abusive to [M]other **in the past**.") (emphasis added).

The trial court pointed out this is an "extremely high conflict" custody matter, which began mere months after Child's birth, with both parties "engaged in extremely contentious and persistent litigation." *See* N.T., 9/16/20, at 63; Trial Ct. Op. at 1-2 ("Some modifications were made in an effort by the Court to reduce continuous tensions and in response to sustained motions practice."). At the time of this writing, Child is relatively young — approximately four years old. On balance, the trial court reduced Father's physical custody periods and eliminated his legal custody rights due to Father's controlling conduct **and** both parties' inability or unwillingness to cooperate. We reiterate the court found: "The level of conflict is so great and has caused this parallel parenting, which clearly is not working based on the contentiousness[, that] **a shared legal custody arrangement is simply untenable."** N.T., 9/16/20, at 64 (emphasis added). Furthermore,

> [t]he Court concluded that Mother is often put in the defensive position to accept insistence by Father, without the ability to negotiate or seek mutually beneficial outcomes. Further, the Court believes that the only way this cycle may cease is to award Mother legal custody as a means of limiting Father's ability to control the dynamic. The same rationale supports awarding Mother primary physical custody, particularly corresponding to weekdays, when legal custody decisions are often executed and consistency is crucial.

Trial Ct. Op. at 9.

Although the trial court found Father continues to attempt to exert control over Mother, we also consider the court's consistent finding that "**[b]oth** parties contribute to a cycle of an unhealthy dynamic that is

unfortunately evidence of a controlling and abusive cycle." **See** N.T., 9/16/20, at 64-65 (emphasis added). **See also id.** at 58 ("[B]oth parties have contributed to the dynamics in this case."), 60 ("[B]oth parties have contributed to this toxic dynamic that exists in this relationship[.]"); Trial Ct. Op. at 8 ("Both parties have engaged in behaviors that depict a high level of conflict in this case."). We also contemplate the court's findings that, regardless of the parties' relationship with each other, they both "perform and are capable of performing the daily parental duties on behalf of [C]hild," and that Child is bonded to both parents. **See** N.T., 9/16/20, at 59.

In light of all the foregoing discussion, we conclude the trial court's reduction of Father's periods of physical custody is supported by the record. **See C.R.F.**, 45 A.3d at 443. The court found that both "Mother and [C]hild are still impacted by controlling, regulatory behaviors by Father," an issue not addressed by Father in his extensive arguments on appeal. **See** Trial Ct. Op. at 10. The court also found the parties' current practice of "parallel parenting . . . is clearly not working," but, pursuant to Section 5328(a)(1), "[M]other, if given the opportunity, will be more likely to encourage" Child's relationship with Father, but "[a]t the current time[, she] hasn't had that opportunity." N.T., 9/16/20, at 57, 64.

We hold, however, given the trial court's findings — that it is both parties who "have contributed to [a] toxic dynamic" and that both parties perform daily parental duties and have a bond with Child, N.T., 9/16/20, at 59-60 —

the court abused its discretion in eliminating Father's partial legal custody and granting sole legal custody to Mother. On the record before us, we reverse the portion of the order that modified legal custody of the child. Upon this reversal, shared legal custody will be restored to both parties.

We acknowledge the trial court's stewardship over this contentious custody matter. We note Child is relatively young; at the time of this writing, she is approximately four years old.

For the foregoing reasons, we reverse the portion of the trial court's order granting sole legal custody to Mother. We affirm the remaining portions of the order.

Order affirmed in part and reversed in part. Jurisdiction relinquished.

Judge Lazarus joins the memorandum.

President Judge Emeritus Bender files a concurring/dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/30/2021

- 36 -